she leave any of her debts or obligations unpaid, could seize upon the remainder to liquidate that indebtedness to themselves. The language of the will is inconsistent with the powers of a limited estate, and, in my judgment, the trust may be destroyed, and becomes void, or at least voidable. Wilson v. Van Epps, 38 Misc. Rep. 486, 77 N. Y. Supp. 980, and cases cited; Shaw v. English, 40 Misc. Rep. 37, 81 N. Y. Supp. 169; Mersereau v. Camp, 42 Misc. Rep. 253, 86 N. Y. Supp. 568.

If the slightest delusion could be spelled out of the language in the codicil as to the testator having given the business of the Westcott Express Company to his son, there certainly was no mistake of fact that out of and from that business, under his concededly shrewd business management, the son had amassed an ample fortune. This is the evidence upon the trial. At all events, it was the rational view taken by the father of the situation at the time the first codicil was made. And without fully knowing in detail just what he had in his mind, as shown by the language used in the entire clause, in my judgment it would be a monstrous proposition to destroy this provision in the first codicil, as that is affirmed by the provision in the second codicil, ratifying and affirming his will thus changed.

The presumption that the testator was sane, and was of a sound, disposing mind, must be sustained; and judgment is therefore ordered confirming and establishing the last will and testament of the said Robert F. Westcott, and each of the codicils thereto. In view of the financial condition of the devisees and legatees of the estate, as contrasted with the financial ability and resources of the defendant Robert E. Westcott, I think the costs and disbursements of this litigation should be charged upon the defendant Robert E. Westcott personally. A judgment and decree may be entered accordingly.

Judgment accordingly.

---

(94 App. Div. 366.)

JACOBUS v. DIAMOND SODA WATER MFG. CO. et al.

(Supreme Court, Appellate Division, First Department. May 20, 1904.)

1. CORPORATIONS—DIRECTORS—FRAUD ON CORPORATION—EVIDENCE.

Code Civ. Proc. §§ 1781, 1782, in effect provide that a director of a corporation may bring an action against one or more of the directors for an accounting for their official conduct, and to compel them to pay the value of any property transferred or wasted. In an action under the statute by a director against the other directors, evidence considered and *held* to show that bonds and a mortgage were given by the corporation to enable a certain person who had obtained control of the corporation to secure the property of the corporation by a foreclosure of the mortgage.

2. SAME—RELIEF.

Where, in an action by a director against the other directors under the statute, it appeared that the directors had issued bonds and a mortgage in order that a certain person who had obtained control of the corporation might acquire its property by foreclosure, the mortgage should be annulled.

3. SAME—DIRECTORS' ACTION—LACHES.

Where an action by a director under the statute was commenced within one month after the issuance of bonds and a mortgage and the assign-

ment of the bonds to one who had organized a rival company, and prior to such acts there had been nothing tangible on which to base an action, plaintiff could not be deemed guilty of laches.

**4. SAME—ACTION BY DIRECTOR—EQUITY ON BEHALF OF PLAINTIFF.**

Code Civ. Proc. §§ 1781, 1782, in effect provide that a director of a corporation may bring an action against one or more of the directors for an accounting for their official conduct, and to compel them to pay the value of any property transferred or wasted. One who had investigated the affairs of a corporation proposed to the stockholders and directors that they sell all their stock, some of it to be sold for cash and some for stock in a new and rival company. The majority of the directors and stockholders accepted the offer, and the corporation, acting in bad faith, issued bonds and a mortgage for an indebtedness due the directors, and they transferred the bonds to the one who made the offer. *Held*, that a bill by a director and other minority stockholders to cancel the mortgage, etc., was not without equity on the theory that plaintiff might have accepted the offer as did the majority of the stockholders.

**5. SAME—ACTION AGAINST DIRECTORS—DEFENDANTS OUT OF OFFICE.**

An action might be maintained under the statute though the defendants had ceased to be directors of the corporation when the action was brought.

**6. SAME—FRAUD OF DIRECTORS—ISSUANCE OF BONDS TO DIRECTORS—BONA FIDE INDEBTEDNESS—BAD FAITH.**

Where a corporation was indebted to its directors, and they caused bonds to be issued to them for such indebtedness secured by mortgage on the corporation's property, but the issuance of the bonds, etc., was in bad faith, in order that they might be assigned to another, who had organized a rival company, the court in an action under the statute would have been justified in canceling the bonds and mortgage.

**7. SAME—LIABILITY OF DIRECTORS.**

The directors were liable for the consequence of their acts so far as they concerned the interests of nonconsenting stockholders.

**8. SAME—CONTRACT BETWEEN CORPORATIONS—VALIDITY—RIGHT OF STOCKHOLDER TO COMPLAIN.**

Where all the parties having any interest in two corporations agree to an arrangement between them whereby all the property of one is used by the other, and the former is supplanted by the other in the business world, no stockholder can complain.

**9. SAME—UNLAWFUL CONDUCT OF DIRECTORS—LIABILITY—MINORITY STOCKHOLDERS' REMEDY.**

Code Civ. Proc. §§ 1781, 1782, in effect provide that a director of a corporation may bring an action against one or more of the directors for an accounting for their official conduct, and to compel them to pay the value of any property transferred or wasted. *Held* that, where the directors of a corporation caused its entire property, including its good will, to be turned over to the management of a rival company without any restrictions or limitations for the protection of the stockholders, a director was entitled to maintain an action under the statute as against those of the directors who had acted innocently in the matter, the arrangement having been ultra vires, and a constructive fraud on stockholders.

**10. SAME—COSTS.**

In such action costs should not be imposed against the directors who were not guilty of bad faith.

**11. SAME—RECEIVER.**

Code Civ. Proc. §§ 1781, 1782, in effect provide that a director of a corporation may bring an action against one or more of the directors for an accounting for their official conduct, and to compel them to pay the value of any property transferred or wasted, and for the removal of a director from his office on proof of his misconduct. And section

1810, subd. 1, authorizes the appointment of a receiver in an action under section 1781. *Held*, that where a director of a corporation sued the other directors under sections 1781 and 1782 for the cancellation of a mortgage given by the directors, etc., the court had jurisdiction to appoint a receiver, though there had been no demand for the removal of the directors, or the election of others in their place.

12. SAME—REMOVAL OF DIRECTORS.

If it should become necessary in the action to remove the directors, they might thereafter be removed, and others appointed in their place.

Appeal from Special Term.

Action by Emanuel Jacobus against the Diamond Soda Water Manufacturing Company and others. From a judgment in favor of plaintiff (77 N. Y. Supp. 898), all the defendants except the City Trust Company appeal. Modified and affirmed.

Argued before VAN BRUNT, P. J., and HATCH, O'BRIEN, INGRAHAM, and LAUGHLIN, JJ.

Leo G. Rosenblatt, for appellants Diamond Soda Water Mfg. Co. and its directors.

Charles L. Kingsley, for appellants American Mineral Water Mach. Co. and its directors.

Benjamin Tuska, for appellants Rothschild, Riglander, and Strauss.

Eugene Treadwell, for respondent

LAUGHLIN, J. . This is a statutory action brought by a director of the Diamond Soda Water Manufacturing Company pursuant to the authority conferred by sections 1781 and 1782 of the Code of Civil Procedure to prevent waste and injury to the property of the corporation, for the cancellation of a certain mortgage and bonds, and for an accounting for mismanagement, and for property wrongfully alienated. By the decision and interlocutory judgment the court has decreed the following relief: (1) The appointment of a receiver of the property of the Diamond Soda Water Manufacturing Company to take possession of its property and manage its affairs until the interests of the parties may justify his discharge and the turning over of the property and management of the corporation to its officers; (2) that the receiver be authorized to discharge the indebtedness of the company and to institute legal proceedings to ascertain to what extent, if any, certain bonds of the company secured by the mortgage, referred to in the complaint, represent a valid indebtedness of the company, and, if so advised, to institute proceedings to set aside said mortgage; (3) that the foreclosure of the mortgage and payment of interest thereon in the meantime be enjoined; (4) that the American Mineral Water Machine Company and its officers and agents be enjoined from managing, controlling, meddling, or interfering with the business or customers of the Diamond Company, or from occupying its offices or workshop; (5) that all agreements or contracts between the defendant companies relating to leases of machines or joint control of the business of the Diamond Company or the occupation of its offices or workshops by the American Company be canceled and annulled; (6) that all the defendants other than itself or the City Trust Company account to the Diamond Company for any and all of its moneys and property alienated, wasted, trans-

ferred, or acquired by them, or either of them, and for the damages sustained by reason thereof, and that a referee be appointed to ascertain such damages; (7) that plaintiff recover costs of all defendants other than the Diamond Company and the City Trust Company, as trustee, together with an extra allowance; and (8) that the parties have leave to apply to the court for such further order or judgment as may be necessary in the premises.

The principal contention on the part of the appellants is that the evidence is insufficient to warrant the relief granted. Their claim, more definitely stated, is that no illegal, fraudulent, or wrongful acts on the part of the officers or directors of the Diamond Company have been shown; that at most the officers and directors have only been guilty of errors of judgment uninfluenced by any dishonest motive; that their acts are as consistent with innocence as with fraud, and therefore the plaintiff has failed to establish a cause of action. An analysis and discussion of all the evidence would unduly lengthen the opinion, and is unnecessary. We deem it sufficient to state certain salient facts which we regard established by the evidence, although in many instances there was conflicting testimony. The court adopted a short-form decision, but all facts warranted by the evidence are deemed to have been found. The Diamond Company is a domestic stock corporation. It was incorporated on the 26th day of July, 1896, for the purpose of manufacturing and selling or leasing machines for carbonating water pursuant to letters patent granted to the defendant Malmstrom and one Loewenstein, which were assigned to the company, and pursuant to improvements thereon. The Company, a few months after its incorporation, established offices and a factory at Nos. 572 and 578 First avenue, in the borough of Manhattan, New York. Prior to the year 1901 it had manufactured and installed under leases in drug stores, saloons, restaurants, clubs, and hotels about 200 machines, which were in successful operation, and upon which it was receiving gross rentals on an average of $4.50 per week for each machine. Its annual reports for the years 1898 to 1901, inclusive, show that its assets exceeded its liabilities by from $2,000 to $4,000. During the nine months preceding October, 1900, its net profits were $9,000, and it was making net profits of about $1,000 per month. It owed certain of its directors for moneys advanced, aggregating several thousand dollars, and it owed a few thousand dollars in addition. It had for a long time been short of funds to pay current obligations, and was constantly pressed for the payment of bills that were past due, especially in the fall of 1900. It is doubtful if it would have been able to continue operations had not one or more of the defendants Riglander, Rothschild, and Strauss, while members of its board of directors, advanced moneys, indorsed its paper, or guarantied its credit from time to time. No judgment, however, was obtained against the company. Its business could have been profitably enlarged if it had had more money. It was not in the fall of 1900 in serious danger of becoming insolvent, provided the advances made by these three directors were permitted to remain; but otherwise it was. Prior to 1897 it had only manufactured 16 machines; but there is testimony to the effect that before the end of that year it had completed between 232 and 240. This may be somewhat inaccurate, but it is mani-

88 N.Y.S.—20

fest that the company was without capital to construct machines in accordance with the demand, and that it did not turn out a great number of new machines after the year 1897. Its expenses were considerable. Its outlay for gas alone was from $400 to $500 per month, and it had quite a force of employés repairing and constructing machines, inspecting those in use, and daily replenishing their supply of water. The inventor Malmstrom was in its employ on a salary as superintendent. The contract between him and the company by which it purchased and he assigned the letters patent provided that he should assign to the company any further improvements made upon the patent. Certain improvements thereon were thereafter patented, and assigned to the company. In the fall of 1900, Loewenstein, one of the directors, resigned, and the defendant Jacobus was elected in his place. About this time Malmstrom manifested dissatisfaction on account of the fact that the directors had not procured more capital, and expressed an intention of severing his relations with the company. He had invented and was constructing the model of another machine for similar use. The principal difference between it and the Diamond Company machine, so far as shown by the evidence, was a new device by which water was pumped into the carbonating cylinder from the water main automatically by electricity whenever the water became low, which dispensed with pumping by hand, required with the Diamond Company machine. There is evidence indicating that the new machine, although also differing somewhat in size from the old, was merely an improvement upon the old, in which event the Diamond Company, under its agreement with Malmstrom, would have been entitled to have the invention assigned to it; but the particulars in which the two machines differed were not brought out either pointedly or clearly upon the trial, and the evidence would not warrant a finding to that effect. The attention of the defendant Mulholland was accidentally drawn to the new machine, and he opened negotiations with Malmstrom for an assignment of the application for letters patent thereon.

In the latter part of January or fore part of February, 1901, the officers and directors of the Diamond Company were informed that Mulholland contemplated buying up the treasury stock and all other stock he could; that he intended to buy out the company and organize a company to manufacture the new machine invented by Malmstrom; and that Malmstrom was to enter the employ of the new company on a salary, and receive a large bonus and a royalty in addition. In February or March Mulholland looked over the plant and books of the company. On the 7th or 8th of February Malmstrom resigned as superintendent, but not as director, and announced that he had sold out, and entered Mulholland's employ. He had in fact so contracted, and the agreement was subsequently consummated. About this time, at a meeting of the directors, a proposition, said to have come from Mulholland, for the purchase of the capital stock of the Diamond Company, was submitted and discussed. The capital stock consisted of 3,000 shares of the par value of $100 each. Two thousand nine hundred of these shares were issued for the patent rights purchased by the company. The other 100 shares were subscribed for by the incorporators, the defend-

ants Riglander, Rothschild, and one Mark J. Strauss. These subscriptions were not paid, and there was a formal agreement on the part of all parties in interest that they were not to be paid at all. There is evidence to the effect that they were subsequently released in consideration of services rendered by the subscribers. The patentees, pursuant to an agreement in writing made on the 12th day of August, 1896, delivered 1,000 of their shares to a trustee to sell for the benefit of the company. There were some sales of this treasury stock, for which the company received about $18,000 in cash and the discharge of obligations amounting to about $5,000 more. There were also some sales of stock owned by individuals. Mulholland's proposition was that those shareholders who had paid in cash to the company should receive the amount which they had paid, with interest thereon; but that otherwise the stock should be exchanged for a proportionate amount of stock in the new company. The plaintiff objected to this proposition, and contended that the stock issued for the patent should be considered on the same basis as the stock issued for cash; but he did not object to a sale on an equitable basis. The spokesman for a majority of the directors declared, however, that they would accept this proposition, and, if the minority did not, they "would be wiped out and receive nothing." At about this time another proposition was submitted as coming from one Lehman, but which some of the evidence indicates also came from Mulholland, to purchase 600 shares of treasury stock at $25 per share. This was conditioned upon Lehman being employed as manager and guarantied an annual salary of $5,000 for three years, and he was to loan the company, if absolutely necessary, $10,000. This proposition was finally withdrawn. Mulholland negotiated the purchase of the stock held by the majority of the directors—four of the seven—who were also officers of the company, and other stock, constituting altogether a large majority of the stock of the corporation, in the main upon the terms proposed except that he reimbursed with interest those from whom he purchased, regardless of whether they purchased from the company or from others. These negotiations were conducted through the directors Riglander and Sloss, the president and manager, respectively; but principally through the former. At the time Mulholland negotiated the purchase of the stock, he likewise arranged to pay the claims of the directors for moneys advanced to the company, or at least led them to believe that he would do this later on. In December, 1900, or January, 1901, Rothschild and Riglander asked the company for the moneys which they had advanced, and which they knew it could not pay. At a meeting of the directors on the 4th day of March, 1901, and after those who had advanced money to the company had agreed upon a sale of their stock to Mulholland, the question of giving them security for the indebtedness was considered at their instance; and a resolution was adopted authorizing the issue of bonds to the extent of $100,000, secured by a mortgage upon the company's property; $52,000 of such bonds to go to the directors for the indebtedness to them and to pay the remaining indebtedness of the company, a statement of which was presented aggregating that amount. No action was taken with reference to the use of the remainder of the bonds. The plaintiff protested and voted against the resolution on the ground

that those who advanced this money did so on the agreement that it was not to be repaid until there were sufficient funds in the treasury to warrant the same, and he charged that it was a scheme to give Mulholland control of the company, and to render the stock of those who did not go in with him worthless. Two-thirds of the stockholders consented to the giving of this mortgage in the form required by the statute; but to most, if not all, those thus consenting the inducement had been previously held out that Mulholland would purchase their stock as he did. Rothschild and Strauss, as officers of the company, executed the mortgage to the City Trust Company which bore date March 1st to secure an issue of bonds aggregating $100,000, with 6 per cent. interest, due in one year, the interest payable quarterly; and it contained the usual chattel mortgage clause authorizing the mortgagee to take possession before default if the debt was deemed insecure. Bonds for the indebtedness of the company to the defendants Riglander, Rothschild, and Strauss, according to the statement presented at such meeting and in accordance with the amount of such indebtedness, as testified to by them and not controverted, aggregating $39,000, were accordingly issued, and shortly thereafter assigned to Mulholland, who paid the face value therefor. On the day that this mortgage was authorized, the American Company was incorporated in Rhode Island for conducting a similar business to that conducted by the Diamond Company. The incorporators were Mulholland, the defendant Sloss, who was then a director and the manager of the Diamond Company, and the defendant Prindle, and they became part of the board of directors. Mulholland was elected president, and Sloss secretary. At meetings of the board of directors of the Diamond Company held on the 12th and 18th days of March, respectively, four of its seven directors, who were the officers, having sold their stock to Mulholland, successively resigned, although their respective terms of office had not expired, and in their places the defendants Prindle, Kingsley, Barnes, and Tuska were elected. Sloss was elected president, and became manager, and Prindle was elected secretary and treasurer. At the same meeting of the board the defendant Sloss reported that the Diamond Company had more space in its shop than was needed for the economical management of the business, and that the American Company desired to lease part of the shop and premises, and to take possession at once, and a resolution authorizing Sloss to make a lease was adopted. Within a day or two thereafter the American Company established its place of business at the office and factory of the Diamond Company, and assumed entire charge of its property and affairs. This was the situation on the 30th day of April, 1901, when this action was commenced. On the 1st day of July thereafter, Sloss, who, as has been seen, was president of the Diamond Company and secretary of the American Company, reported to a meeting of the board of directors of the Diamond Company that he had effected an arrangement with the American Company by which it was to have the right to maintain and operate all machines of the Diamond Company outstanding under leases, and the right to build new machines under the Diamond Company's patents, but at its own expense, and to receive the rents of the outstanding machines and those thereafter leased upon condition that it pay the Diamond Company a

rental of $25 per year for each large machine and $5 per year for each small machine, the expense of maintaining the machines and manufacturing new ones to be borne by the American Company; but the Diamond Company was to pay "a little over" one-quarter of the office expenses, the precise amount apparently not having been definitely agreed upon.   The board of directors of the Diamond Company thereupon adopted a resolution approving and ratifying this action of its president.   Evidence was given on the part of the defendants tending to show that this arrangement between the defendant companies, although not ratified by the board of directors until the 1st of July, was in fact made at the outset when the American Company took charge. The contract apparently rested in parol.   It does not definitely appear how many small and how many large Diamond Company machines were in use at this time, or what would probably be the amount of rentals that it would receive from the American Company; but it is evident that that was left largely to the management of the latter company, and that the rentals would not be sufficient to pay the principal upon the bonds when due; nor does it clearly appear that they would be sufficient to pay the interest.   The American Company does not appear to have incurred any obligation to manufacture or lease Diamond Company machines.   It merely obtained the right to do so.   It seems to have been left at liberty to supplant the Diamond Company machines with his own manufactured pursuant to Malmstrom's new invention, the application for letters patent upon which he had assigned to the new company.   The letters patent were granted, but never issued.   Shortly after the American Company took possession of the offices and factory of the Diamond Company, it took into its employ all the former employés of the old company, conspicuously posted its signs, and replaced the blank forms and letter heads of the Diamond Company with its own, and appropriated the old telephone number.   The communications to the Diamond Company were answered not in the name of that company, but by the American Company.   The trade was given to understand, in effect, that the new company had superseded the old.   Although it has manufactured and installed some new machines of the Diamond Company pattern, it has in many instances replaced the Diamond Company machines with its own.   It does not appear to have made any systematic effort to replace Diamond Company machines, but the prompt beginning and pendency of this action may account for its inactivity in that direction.   Applications or inquiries concerning the cost or rentals of the Diamond Company's machines were answered by information calculated to lead to the purchase or leasing of the American Company's machines in preference.   This was the course of business from the formation of the American Company and its taking possession of the property of the Diamond Company.

In these circumstances it is not difficult to forecast the future of the Diamond Company if it is to be left to the American Company.   It is a reasonable inference from the evidence that it was Mulholland's purpose from the outset to obtain the control of the Diamond Company, and to appropriate its property and good will to the benefit and advantage of the American Company, that the officers and directors of the Diamond Company who sold and transferred their stock to Mul-

holland were aware of his purpose, and that the mortgage and bonds were given and the latter transferred to Mulholland with the purpose on his part of so managing the affairs of the Diamond Company, through a majority control of those interested in the American Company, as to bring about a default in the payment of interest, and enable him to acquire the property of the Diamond Company by a foreclosure of the mortgage. That this would be the probable result of the action taken must have been known to the former officers and directors of the Diamond Company, and the fair inference is that the security was demanded and given in furtherance of this scheme. Within all the authorities, therefore, the execution of the mortgage and bonds and the assignment of the latter should be deemed in fraud of the rights of the minority stockholders of the Diamond Company, and should have been annulled. Gamble v. Q. C. W. Co. et al., 123 N. Y. 91, 25 N. E. 201, 9 L. R. A. 527; Skinner v. Smith, 134 N. Y. 240, 31 N. E. 911; Farmers' Loan & Trust Co. v. N. Y. & N. R. Co., 150 N. Y. 410, 44 N. E. 1043, 34 L. R. A. 76, 55 Am. St. Rep. 689; People v. Ballard, 134 N. Y. 269, 32 N. E. 54, 17 L. R. A. 737; Sage v. Culver, 147 N. Y. 241, 41 N. E. 513; Barr v. N. Y. L. E. & W. R. Co., 125 N. Y. 263, 26 N. E. 145; Pondir v. N. Y., L. E. & W. R. Co., 72 Hun, 384, 25 N. Y. Supp. 560.

The appellants further contend that the complaint should be dismissed for laches in bringing the action. The basis of this claim is that plaintiff knew the facts herein stated at or shortly after the time the various acts occurred. These matters all occurred in a comparatively brief period of time. Prior to the authorization of the mortgage and bonds and to the incorporation of the American Company on the 4th day of March, nothing tangible had taken place to warrant the commencement of the action. Only a month elapsed thereafter before it was brought. In the circumstances, it cannot be claimed that the plaintiff was not justified in waiting a reasonable time for further developments, and until something occurred directly between the companies to the prejudice of the Diamond Company. The court therefore would not be warranted in dismissing the complaint on the ground of laches.

The appellants also claim that the complaint should have been dismissed for want of equity. This is based upon the fact that the plaintiff and the other minority stockholders who retained their stock were offered an opportunity at the time to sell their stock upon the same basis as the majority stockholders, namely, to receive for stock for which cash had been paid to the company the amount of such cash, and for other stock a proportionate amount of stock in the new company, which offer was renewed upon the trial, together with the further offer to reimburse them the amount of any advances or disbursements made for the company, with interest. We fail to see merit in this contention as applied to the facts of the case at bar. The stockholders of the Diamond Company individually, acting in good faith for their own interests, were at liberty to sell their stock, and to resign as officers and directors; but, being officers and directors, they were not at liberty by concerted action to obtain security upon all the property of the company for advances made for the purpose of transferring the same, pursuant to a prior agreement whereby they were to be paid the

face value of their claims and accrued interest in cash, and make a favorable disposition of their stock to the principal stockholder in a rival corporation with knowledge of his purpose and intent to use the same for the purpose of obtaining control and acquiring the property of the Diamond Company, and thus rendering the stock of the minority holders worthless.

Prior to the commencement of the action the defendants Rothschild, Riglander, and Strauss ceased to be directors of the Diamond Company, and for this reason they contended that the action given to a director by virtue of the provisions of section 1781 and 1782 of the Code of Civil Procedure is not maintainable against directors out of office. The object of the statute was to authorize an action to prevent waste and injury to the corporate property, and to recover property of the corporation wrongfully and unlawfully disposed of, and damages of and an accounting by the wrongdoer. They were necessary parties because part of the relief demanded was the cancellation of the mortgage and bonds given for their benefit. But, aside from this, the efficiency of the statute would be seriously impaired were it held that the action could only be maintained against directors while in office. It will be observed, however, that the court has not adjudged the invalidity of the mortgage or bonds, or directed their cancellation. The court has merely decided in that regard that the security was fraudulently given with a view to enabling Mulholland to obtain the control and property of the corporation. The parties in interest all being before the court, in these circumstances it would seem that the court would have been justified in canceling the mortgage and bonds, because, even though there be some actual indebtedness as a basis for their issue, if the directors to whom it was contemplated that the bonds should be issued were not entitled thereto, or the issue was made for this fraudulent purpose, the mortgage and bonds could have been canceled without impairing the claim upon the actual indebtedness, and an appropriate provision in the judgment would prevent its becoming a bar to the enforcement of any rights of the claimants or their assignee for moneys advanced to the company. However, as has been observed, so far as bonds have been issued secured by this mortgage it appears that they were issued for a valid indebtedness. There is no evidence that the defendant Strauss agreed to allow his advances to stand until the company should be able to pay the same without embarrassment. The only satisfactory evidence of any agreement on the part of the other parties to whom bonds were issued for advances made to allow their advances to await the financial convenience of the company is a letter addressed by them to the company on the 21st day of December, 1896, in and by which they agreed to make no demand on the company for past advances made by them "until such time as your company earns all or part of the amount advanced by us by the rentals of carbonators or the sale of carbonated water, or until your company sells treasury stock; provided, however, that Mr. Malmstrom and Mr. Loewenstein continue their services to the company as at present, and faithfully discharge their duties." In the fall of 1900 Loewenstein resigned as a director, and Malmstrom resigned his position as superintendent prior to the giving of this mortgage. It thus appears that the relations of

these parties to the company had changed, and the defendants Rig-lander, Rothschild, and Strauss, who made the agreement, were not prohibited by the terms thereof from then demanding their advances, or security therefrom, if demanded in good faith. But, as has been seen, they demanded and obtained the security in bad faith. They intended to use the bonds to effect a sale of their stock, and to realize on their claims at once, well knowing that the only object of the purchaser was to compass the ruination of the company, the management of whose affairs was in their hands as trustees, and at a time when they knew the company, if pressed for payment then or when the indebtedness, by the terms of the mortgage, became due, would be unable to meet the obligation, and would very likely be subjected to a foreclosure and sale of all its property. It is, however, difficult to see what they may be required to account for at the present time, so far as the mere giving of the mortgage and bonds is concerned. The inference is fairly justified that they were aware of Mulholland's purpose to acquire the control and management of the affairs of the Diamond Company, and to conduct its affairs in the interest of himself and the other stockholders of the American Company, and that the execution of the mortgage and bonds upon the property of the Diamond Company to secure the same were desired by him in furtherance of that purpose. In view, therefore, of their trust relations with the company, the court would have been justified in canceling the bonds and mortgage, as all the parties in interest are before the court. In these circumstances Riglander, Rothschild, and Strauss are liable for the damages sustained by the Diamond Company in consequence of their acts in turning its affairs over to the new rival company, at least so far as the interests of the nonconsenting stockholders are concerned. Farmers' Loan & Trust Co. v. N. Y. & N. R. R. Co., supra; Skinner v. Smith, supra, and other cases supra.

The defendants Kingsley, Barnes, and Tuska, three of the new directors of the Diamond Company, were charged with actual fraud, and they were therefore justified in defending the action. They were not called as witnesses, nor was Mulholland. The inference is doubtless justified that they became directors at the instance of Mulholland; but it does not appear that they knew of any fraudulent purpose on his part, nor is it shown that they were aware that any of the officers, directors, or stockholders of the Diamond Company had any objection to the arrangement subsequently made between the two companies. Kingsley has only five shares of stock. His only connection with the American Company is that he is an attorney in the office of its attorneys. Tuska, who represented one of the directors in closing his transfer to Mulholland and Barnes, is an employé of the American Company. For aught that appears, they may have supposed that there was a common understanding, assented to by all parties in interest, to make the contract and establish the relations that were subsequently made and established between the companies. If so, no stockholder could complain. Skinner v. Smith, supra; People v. Ballard, supra. The plaintiff remained a member of the board of directors, and it does not appear that he protested or voted against the subsequent proceedings or the taking possession of the offices and factory of the Diamond Company by the American Company, or in any manner complained to these three defend-

ants. They are, however, proper parties to the action, and although, so far as appears, they may have acted innocently, the minority stockholders, neither having assented to the arrangement nor having done anything to estop them from demanding an accounting for mismanagement, are entitled to such an accounting even against the directors who may have acted in good faith, for the reason that it is manifest that it was not a mere temporary arrangement, such as it was intimated in Denike v. N. Y. & R., Lime & Cement Co., 80 N. Y. 599, 606, might be legal, but one by which the entire property, including the good will of the Diamond Company, was turned over to the management of a rival company, without any restrictions or limitations for the protection of the stockholders. The arrangement was clearly ultra vires (People v. Ballard, supra), and a constructive fraud upon the stockholders of the Diamond Company. The Diamond Company virtually suspended the functions for which it was incorporated, and of this any of the stockholders who were not parties to the arrangements, or the state, might complain, and demand a restoration. People v. Ballard, supra. The directors, therefore, may be required to account; but, for the reasons stated, costs should not be imposed against the three directors last named. Although there is no demand for the removal of the directors or the election of others in their stead, the court in these circumstances acquired jurisdiction to appoint a receiver (Code Civ. Proc. § 1810, subd. 1; Halpin v. Mutual Brewing Co., 91 Hun, 226, 227, 36 N. Y. Supp. 151); and, if it shall become necessary, the directors may hereafter be removed, and others appointed in their place (Code Civ. Proc. § 1781).

The exceptions taken upon the trial and the other points raised by the appellant have been examined, but we think they do not present reversible error, or merit special discussion.

It follows, therefore, that the interlocutory judgment should be modified by eliminating the provision awarding costs against the defendants Kingsley, Barnes, and Tuska, and, as thus modified, it should be affirmed, with costs against the appellants other than Kingsley, Barnes, and Tuska. All concur; INGRAHAM, J., in result.