(84 Misc. Rep. 291)

### DRUCKLIEB v. HARRIS.

(Supreme Court, Special Term, New York County. February, 1914.)

1. CORPORATIONS (§ 320*)—OFFICERS—WASTE OF PROPERTY—ACCOUNTING.

Where, after a solvent corporation had made a general assignment for the benefit of creditors, it filed a petition in bankruptcy, and its president and chief stockholder bought in his own right all its property, and where, in a stockholder's action to impress a trust on the property, it appeared that defendant's purchase was in fulfillment of a plan to oust plaintiff from the corporation and to destroy the value of his stock therein, and

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that since commencement of the action defendant had transferred the property to other corporations not before the court, thereby preventing an effective decree declaring a trust, plaintiff was entitled to a judgment that defendant account to the corporation for the loss suffered through the waste of its property.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1426–1431, 1433–1439; Dec. Dig. § 320.*]

2. TRUSTS (§ 102*)—SALE OF CORPORATE PROPERTY—PURCHASE BY CORPORATE OFFICER.

Where an officer of a corporation, who is also a majority stockholder, puts its property up for sale in order to exclude a minority stockholder, and buys it in for himself, equity will charge the property in his hands with a constructive trust.

.[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 153; Dec. Dig. § 102.*]

Action by Julius C. Drucklieb against Sam H. Harris. Judgment for plaintiff.

See, also, 158 App. Div. 873, 142 N. Y. Supp. 912; 209 N. Y. 211, 102 N. E. 599.

Manley & Grand and Louis O. Van Doren, all of New York City, for plaintiff.

Ferris, Dannenberg & Ansbacher, of New York City, for defendant.

CARDOZO, J. [1] This action is brought by a stockholder in the right of the corporation to impress a trust upon property in the hands of its president. Sam H. Harris, Incorporated, made an assignment for the benefit of creditors on February 5, 1913. On the next day, there was a petition in bankruptcy, and the business was continued through the appointment of a receiver. On March 14, 1913, Sam H. Harris, the president of the company and its chief stockholder, bought all its property from the receiver, in consideration of his payment of the debts, 20 per cent. in cash, and 80 per cent. in notes running over a period of 16 months, and in consideration also of the payment of the expenses of the proceeding in bankruptcy. I am satisfied that this purchase was the fulfillment of a plan conceived by Harris to oust the plaintiff from the company and to destroy the value of the plaintiff's stock. There is no break in the acts that evince the continuity of his purpose. The plaintiff held 273 shares out of a total 750; Harris held 427; and his two sons 50. As early as July, 1912, Harris had begun to bargain for the purchase of the plaintiff's shares. A contract with the plaintiff bound Harris, if the plaintiff was not continued as secretary and treasurer of the company for a director, to buy the plaintiff's shares at the then existing book value. An offer of $10,000 for plaintiff's shares, partly in cash and partly in notes, was rejected by the plaintiff, with significant warnings by Harris of future loss as the penalty. At once Harris changed the book value of the shares by transfers to the profit and loss account. Some of these transfers were proper; others were not proper, for the business was a going one and its assets were to be valued accordingly. On October 31, 1912, the plaintiff brought an action against

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Harris and the company for a decree that these changes in the books be adjudged erroneous, and that the book value be correctly stated. The varying phases of that litigation may be followed in the reports Drucklieb v. Harris, 155 App. Div. 83, 140 N. Y. Supp. 60, reversed 209 N. Y. 211, 102 N. E. 599.

Harris at once became vehement in his denunciation of the plaintiff and in his prediction of the company's ruin. He gave notice in December that the plaintiff's contract for employment as secretary and treasurer was at an end. At a stockholders' meeting in January, 1913, he caused the plaintiff to be dropped as a director, and elected a new board composed of himself, his two sons, and one of the company's employés. He protected himself against loss through the impending changes by paying $5,000 to his wife and $2,000 to himself in discharge of loans; and placed the money in a bank account maintained in the joint names of his wife and himself. He then gave notice of a special meeting of the stockholders, to be held on February 4, 1913, to consider the company's finances, selecting a date when he knew that the plaintiff could not attend. He did not inform the plaintiff that he was going to propose the execution of a general assignment. His explanation of this omission is that he did not form the purpose of making the assignment until the meeting, and that until then his only desire was for the full and free discussion of the company's affairs. It is unfortunate that this desire was not more effectually manifested. As a result, he deliberated with his two sons, in the absence of the one man, other than himself, who had any substantial interest in the outcome. He submitted at the meeting a long statement, bearing all the marks of premeditation, in which he maintained the wisdom of an assignment. The resolution contains the recital that:

"The said corporation is solvent and has sufficient funds to meet all obligations, provided sufficient time is given to realize upon these assets in the ordinary due course of business."

On the following day, the assignment was made. The plaintiff knew nothing of it in advance of the making. By concession the company was solvent in the sense of having assets in excess of liabilities. There is no satisfactory evidence that it was insolvent in the sense of being unable to meet its debts as they matured. Undoubtedly the company had for many months been hampered by lack of ready cash. But its creditors were not pressing it in any such degree as to justify the drastic remedy of a general assignment. I have no doubt that if Harris had been advised that he had no right to buy the company's property for his own use, and that any purchase made by him would be ineffective to rid him of the plaintiff, there would have been a precipitate abandonment of the scheme to declare the company insolvent. The events that follow reflect alike the continuity of his purpose to use the assignment as an instrument for the exclusion of the plaintiff, his recognition of the value of the business as a going concern, and the steadfastness of his determination to gain its benefits for himself by obstructions and evasions that would conceal his part in the transaction. On the very day of the filing of the petition in

bankruptcy, which was the day after the general assignment, he wrote a letter to the creditors in which he reiterated his belief that the company was "absolutely solvent," though unable, as he professed, to pay its debts as they matured, and then announced that he was already making plans, which would be presented to the creditors in a few days, that would result "in her receiving their money in full, and wiping out the bankruptcy proceedings."

The initial payment of 20 per cent. required to complete the purchase was made up chiefly through the application of money in the hands of the receiver; all that Harris supplied being $6,616. He says he borrowed this from his wife. It was substantially the same amount that he had withdrawn from the company a few weeks before. It came, in fact, out of a bank account kept in their joint names, on which either had the right to draw. The readiness with which creditors gave an extension for 16 months attests the absence of any urgent pressure. Harris took the assignment of the company's assets in his own name, but he now says that he took it in trust for his wife. It would take too long to describe all the devices by which he tried to make it appear that she had some interest in the transaction. They are significant chiefly as bearing witness to the strength of his desire to keep the property from the plaintiff. It is sufficient to say that I am convinced that he was the purchaser in his own right. The purchase became known to the plaintiff about March 17, 1913, and on March 21, 1913, this action was begun. A few hours later Harris caused the property to be transferred to a new corporation, the Harris Tobacco Company. His wife, after a short interval, became its president; he was from the beginning its general manager; and the business of Sam H. Harris, Inc., was thus continued at the same location, without the break of a day, and with no change except the substitution of a new name, the Harris Tobacco Company, and the exclusion of the plaintiff. When the transfer to the Harris Tobacco Company was made on March 21st, an injunction had been served prohibiting Harris from disposing of the property. He says that the transfer did not violate the injunction, because he had already made a transfer to an attorney, who is now said to have held the property in trust for Mrs. Harris. The transfer to the new corporation in form proceeded from the attorney. I find, however, that Harris was in fact the beneficial owner. The injunction was not continued at Special Term, but was reinstated by the Appellate Division in July, 1913 (158 App. Div. 873, 142 N. Y. Supp. 912). The court said:

"The facts, as they appear upon this record, fairly justify the presumption that the assignment and the subsequent proceedings in bankruptcy were in pursuance of a fraudulent scheme on the part of the respondent, Sam H. Harris, to acquire for himself the assets of the corporation at the expense of the appellant, the only other important stockholder."

To avoid the consequences of this decision, Harris caused a new corporation, Fernandez & Garcia, to be formed, and a large part of the property of the Harris Tobacco Company was transferred to the new corporation in return for its promissory notes. When we consider the defendant's professed belief that the business of Sam H.

Harris, Inc., had no value as a going concern, and that he paid for its property more than the true value, we may find significance in the persistence and vitality of his desire to retain the property for himself. The only explanation suggested by him is his wish to escape liability as indorser of the notes of Sam H. Harris, Inc., on which he was liable to the extent of $35,000. His indorsement, however, was worthless. He had been through bankruptcy once, and he had, so he tells us, no property outside of his investment in this business. From beginning to end his sole purpose was to rid himself of an unwelcome associate.

[2] In these circumstances, the duty of a court of equity is not doubtful. An officer of a corporation, who is also a majority stockholder, will not be permitted to put its property up for sale in order to exclude a minority stockholder, and buy it in for himself. Equity will charge the property in his hands with a constructive trust. The law on this subject is well settled. Jacobus v. Diamond Soda Water Mfg. Co., 94 App. Div. 366, 88 N. Y. Supp. 302; Hinds v. Fishkill Gas Co., 96 App. Div. 14, 17, 88 N. Y. Supp. 954; Farmers' Loan & Trust Co. v. New York & Northern R. R. Co., 150 N. Y. 410, 44 N. E. 1043, 34 L. R. A. 76, 55 Am. St. Rep. 689; Abbot v. American Hard Rubber Co., 33 Barb. 578, 594; Hoyle v. Plattsburgh & M. R. Co., 54 N. Y. 314, 13 Am. Rep. 595; Ervin v. Oregon Ry. & Nav. Co. (C. C.) 20 Fed. 577. If the property were still in the ownership of Harris, the decree would be one requiring him to restore it to the corporation under proper conditions of reimbursement and indemnity. Since the action was begun he has caused the property to be transferred to other corporations not before the court. Having thus frustrated an effective decree declaring and impressing a trust, he must account to the corporation for the loss that it has suffered through the waste of its property. Bosworth v. Allen, 168 N. Y. 157, 61 N. E. 163, 55 L. R. A. 751, 85 Am. St. Rep. 667; O'Beirne v. Alleghany K. R. R. Co., 151 N. Y. 372, 45 N. E. 873; Valentine v. Richardt, 126 N. Y. 272, 27 N. E. 255.

The amount realized through the bankruptcy sale is no test of the value. To avoid misconstruction, it should be said that the petitioning creditors and their attorney, and the receiver and his attorneys, acted throughout the proceeding in good faith, and they are not subject to any criticism. But the value of the property on a forced sale in liquidation does not measure its value when belonging to a going concern, and it is the value to a going concern that must govern here. My judgment is that the value of the property in excess of the liabilities in February and March, 1913, was $20,000. In forming this judgment, I have taken as a point of departure the balance sheet of December 31, 1912, prepared about a month before the bankruptcy. I have excluded certain assets which were there overvalued. I have added certain items which had been improperly charged to profit and loss in the previous July. Many other significant circumstances have not been overlooked. I have not felt justified in ascribing to the items of brands, trade-marks, and good will any value beyond the nominal one of $1,000 placed on it by Harris. Matter of Silkman, 121 App. Div. 202, 105 N. Y. Supp. 872, and cases there cited.

I 'cannot accede to the plaintiff's request that the judgment should award directly to the plaintiff such proportion of the damages as his stock bears to the total issued stock. The action is a derivative one, and the judgment must be in favor of the corporation, which in legal theory is the real plaintiff. Ebling v. Nekarda, 148 App. Div. 193, 132 N. Y. Supp. 309. This conclusion is not altered by the fact that, with the exception of the Harris family, the plaintiff is the sole stockholder. In view of the bankruptcy proceeding, it is unlikely that there are unpaid creditors, but it is not impossible. It does not even appear that the corporation was ever discharged from its debts. A discharge, if granted, would be effective only as against creditors duly notified. There may be creditors on the books who never received notice. There may be other creditors not on the books at all. There may be still others whose claims could not be extinguished by any discharge. The statutes of this state define the method of ascertaining creditors upon the dissolution of a corporation, and until those conditions have been satisfied, a distribution among stockholders is unlawful. Darcy v. Brooklyn & New York Ferry Co., 196 N. Y. 99, 89 N. E. 461, 26 L. R. A. (N. S.) 267, 134 Am. St. Rep. 827. The plaintiff is entitled to judgment that the defendant Sam H. Harris is accountable to the corporation for $20,000, with interest from March 14, 1913, and he will be directed to pay that sum to a receiver who will be appointed by the judgment with authority to enforce its collection. The plaintiff is also entitled to the costs of the action. The proposed findings have been passed upon. A decision and judgment should be submitted in accordance with this memorandum.

Judgment accordingly.